# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs March 29, 2011

## STATE OF TENNESSEE v. DEBRA ELAINE MOORE KIRK

**Appeal from the Circuit Court for Cocke County**
**No. 9080     Ben W. Hooper, II, Judge**

---

**No. E2010-01390-CCA-R3-CD - Filed November 28, 2011**

---

The defendant, Debra Elaine Moore Kirk, stands convicted of criminally negligent homicide, a Class E felony, and aggravated child abuse, a Class A felony.  The trial court sentenced her as a Range I, standard offender to an effective sentence of 25 years in the Tennessee Department of Correction.  In a previous appeal, this court ruled that the defendant waived all issues other than sufficiency of the evidence by failing to file a timely motion for new trial and affirmed the judgments of the trial court.  *See State v. Debra Elaine Moore*, No. E2007-00533-CCA-R3-CD (Tenn. Crim. App., Knoxville, June 23, 2008).  A post-conviction court granted post-conviction relief in the form of a delayed appeal.  In this appeal, the defendant argues that the trial court erred by allowing certain testimony from the medical examiner and that the evidence was insufficient to support her convictions.  Our previous determination that the evidence was sufficient to support the defendant's convictions is the law of the case, and we do not consider this issue.  Following our review of the remaining issues, we conclude that the trial court committed no reversible error and affirm the judgments of the trial court.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and D. KELLY THOMAS, JR., JJ., joined.

Carter S. Moore, Newport, Tennessee, for the appellant, Debra Elaine Moore Kirk.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; James B. Dunn, District Attorney General; and Amanda H. Inman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On April 21, 2003, the Cocke County grand jury charged the defendant, Debra Elaine Moore Kirk, with first degree felony murder and aggravated child abuse. Following a jury trial, she was convicted of criminally negligent homicide and aggravated child abuse. *See State v. Debra Elaine Kirk*, No. E2004-01263-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., at Knoxville, Sept. 30, 2005). The trial court sentenced her to an effective sentence of 25 years. *Id.* The defendant appealed, and this court found reversible error in the trial court's admission of evidence of the defendant's prior drug use. *Id.*

The defendant's case proceeded to a second jury trial in 2006, and the jury again convicted the defendant of criminally negligent homicide and aggravated child abuse. *See Debra Elaine Moore*, slip op. at 1. The defendant filed an untimely motion for new trial and untimely notice of appeal, resulting in waiver of appellate review of all issues other than sufficiency of the evidence. *Id.*, slip op. at 2. This court concluded that the evidence was sufficient to sustain her convictions and affirmed. *Id.*, slip op. at 4.

The defendant filed a *pro se* petition for post-conviction relief on December 8, 2009, alleging, among other things, that she was deprived of the effective assistance of counsel at trial. She filed an amended petition through counsel on April 28, 2010, adding a claim of ineffective assistance of counsel based on trial counsel's failure to file a timely motion for new trial. The post-conviction court granted post-conviction relief in the form of a delayed appeal. The defendant filed a timely notice of appeal from her trial judgments following the post-conviction court's ruling.

In our discussion of the sufficiency of the evidence in *State v. Debra Elaine Moore*, this court summarized the facts of the case as follows:

> The evidence presented during trial reflects that the defendant purchased OxyContin pills on July 22, 2002. The victim's father crushed the pills in their residence, and he and the defendant ingested the drug. Later that evening, the three-month-old victim awoke and would not go back to sleep. The defendant told police that she tried to get him to go back to sleep but was unsuccessful. Therefore, she rubbed the victim's wet pacifier in the crumbs of the crushed drugs and put the pacifier back in the child's mouth. The child then went back to sleep. The victim's father woke the defendant the next morning because he was screaming that the baby was not breathing. They called 9-1-1, and the victim was taken to the hospital after

-2-

paramedics were unsuccessful in reviving the child. The victim died two days later. The medical examiner noted severe damage to the victim's kidneys and brain consistent with the ingestion of OxyContin.

The defendant argues that the evidence and trial testimony are inconsistent. Specifically, she contends that the State's theory of cause of death is not supported by the evidence presented. However, after review of the record as a whole, we conclude that the evidence was sufficient to support the finding of guilt. Here, the defendant provided a statement to police about her actions regarding the child. She told the detective that the baby would not go back to sleep so she took his pacifier to where the OxyContin had been crushed up. The pacifier was wet from the baby's mouth and she "stuck it in the dust and crumbs" before putting the pacifier back into the baby's mouth. The medical examiner testified that the autopsy of the child revealed severe changes in the victim's brain and kidneys, which appeared to be caused by a toxic substance. The medical examiner further testified that a test of the victim's blood detected the presence of oxycodone, the registered name for OxyContin, which is consistent with the defendant's statement. As a result of the blood testing, the medical examiner amended her autopsy report to reflect that the cause of the victim's death was oxycodone toxicity.

*Debra Elaine Moore*, slip op. at 3-4.

## *I. Sufficiency*

The defendant challenges the sufficiency of the convicting evidence, as she did in her previous appeal following her second trial. "Under the doctrine of the law of the case, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case, which must be followed upon remand." *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) (citing *State v. Jefferson*, 31 S.W.3d 558, 560-61 (Tenn. 2000)). An issue decided in a prior appeal may only be reconsidered where:

(1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would

result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.* In the defendant's first appeal from her second trial, the trial now under review in this delayed direct appeal, this court determined that the evidence was sufficient to support her convictions. *Debra Elaine Moore*, slip op. at 4. Because the defendant has failed to establish any circumstance warranting reconsideration, this issue is governed by the law of the case.

## II. Medical Examiner's Testimony

### A. Phone Message

The defendant argues that the trial court erred by allowing the medical examiner, Doctor Darinka Mileusnic-Polchan, to testify about a telephone message taken by her secretary from the toxicologist who examined the victim's blood and liver sample. The defendant contends that the written message was double hearsay, and no exception to the hearsay rule applied. She further contends that testimony about the written message violated her right to confront the witnesses against her.

Prior to trial, the parties stipulated the admissibility of a letter written by Doctor Christopher Long, a toxicologist, that stated that the laboratory could not report a positive test result because the sample of the victim's blood failed to meet one of two criteria:

> Dear Dr. Mileusnic: Our protocol has been to test any sample with suspected oxycodone, either in the history or screening test results, by gas chromatography-mass spectroscopy.
>
> In this testing, there are two requirements, one is the retention time (or how long the drug stays in the instrument) and the second is ion ratios of the mass spectrum, the fingerprint. This 'fingerprint' is generated when the drug leaves the gas chromatograph and enters the mass analyzer. Upon entrance the drug is hit with very energy [sic] causes it to explode, providing the fingerprint identification.
>
> In this case the first criteria was met, that is the retention time. The second criteria were not met. The ion ratios were not acceptable and we could not report the oxycodone as positive.

-4-

This is most reasonably due to the dilution effect as we had very little sample to analyze.

If the drug does not meet acceptable criteria then we must report it as negative.

I hope this clarifies the process that we followed. Should you have any further questions please contact me.

Sincerely, Christopher Long, Ph.D.

The State offered the letter into evidence during Doctor Mileusnic-Polchan's testimony. Following the reading of the letter, Doctor Mileusnic-Polchan testified that after receiving the report from Doctor Long, she changed the victim's cause of death from "undetermined" to oxycodone toxicity. As Doctor Mileusnic-Polchan attempted to explain that her determination was informed by both the letter and by a telephone message she received from Doctor Long while she was on maternity leave, the following exchange occurred:

[Prosecutor]: And then after this report from Doctor Long you changed it to that. Now why did you do that?

[Doctor Mileusnic-Polchan]: In addition to this communication I also had a telephone - - a communication of a telephone message from D[octor] Long with our office where he originally tested the sample and the oxycodone was positive. As a matter of fact, I have the telephone message right here in front of me where he stated that - -

[Defense counsel]: Objection to hearsay, Your Honor. This report has come in. I don't know what was said on a telephone conversation, Your Honor. He's not here to be cross-examined, Your Honor. That's hearsay.

[The court]: This is something that, as I understand, you have relied upon?

[Doctor Mileusnic-Polchan]: As a matter of fact, this is the telephone message written to me by my secretary.

[The court]: The Court will overrule. You took this into consideration in reaching your conclusion?

[Doctor Mileusnic-Polchan]: Definitely.

[The court]: Okay. The Court will overrule the objection.

        . . . .

[Prosecutor]: You may answer.

[Doctor Mileusnic-Polchan]: So anyway, the telephone message that was written by my secretary on September 24, while I was on maternity leave, from D[octor] Chris Long, from the St. Louis Toxicology Laboratory, there's a telephone number here and it stated to call him back regarding [the victim]. The message is following: The - -

[Defense counsel]: I object again, Your Honor. She said she had a phone call with D[octor] Long. This is coming off a message from the secretary. She didn't even talk to D[octor] Long. That's double hearsay. We don't know what was told to the secretary and we don't know why she wrote down what she wrote down.

[The court]: The Court will still overrule the objection, but this is something I guess all medical reports are done by somebody else. The doctors don't do them. . . . So it's a question - - and I'll not go into the reason. It's a discretionary matter with the Court and the Court will allow it.

        . . . .

[Doctor Mileusnic-Polchan]: Let me explain the sequence of events. The message was first. When I came back from maternity leave about a week later because that was the end of September I called him back and I requested the letter that was just . . . stipulated to . . . to be an official document and not just hearsay from communication, and that's why I'm bringing this into discussion in court. Anyway [sic] to confirm one or the

-6-

other, it stated that they're toxic, the levels of OxyContin are more toxic, and he wanted to know whether I want[ed] him to test more. So basically, the toxicologist found the oxycodone and he wants me to give him permission to test more. And therefore, we had double the communication of the OxyContin being positive.

In her motion for new trial, the defendant argued that the court "erred when it ruled that the notes from the secretary for the ME from Doctor Long could be used in testimony" because the notes were hearsay and because such testimony violated the defendant's right to confrontation. On appeal, the defendant makes the same argument and adds that the effect of "allowing this telephone message into the record" was that "the trial court allowed the State to 'impeach' their own stipulated report."

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay is not admissible except as provided by these rules or otherwise by law." *Id*. 802. Tennessee Rules of Evidence 803 and 804 provide exceptions to the general rule of inadmissibility of hearsay. Because "[n]o factual issue attends" the trial court's determination whether a statement is hearsay, "it necessarily is a question of law." *State v. Gilley*, 297 S.W.3d 739, 760 (Tenn. Crim. App. 2008) (citing *State v. Schiefelbein*, 230 S.W.3d 88, 128 (Tenn. Crim. App. 2007); *Keisling v. Keisling*, 196 S.W.3d 703, 721 (Tenn. Ct. App. 2005)). Although the application of the various exceptions to the hearsay rule "may initially depend upon factual determinations" to which a reviewing court must defer, the trial court "has no discretion to exclude hearsay exception evidence that is otherwise admissible under the rules of evidence." *Id.* at 760-61. Thus, the appropriate standard of review to be applied to the trial court's decision admitting or excluding hearsay evidence is de novo.[1] *Id.*

Doctor Mileusnic-Polchan did not read into evidence the message relayed by her secretary, but she did testify that Doctor Long communicated to her secretary that the initial test of the victim's blood was positive for the presence of oxycodone. Both the secretary's statement that Doctor Long had called and left a message along with Doctor Long's statement qualify as hearsay even though neither was repeated verbatim by Doctor Mileusnic-Polchan. Moreover, the record establishes that both statements were admitted to prove the truth of the matter asserted, that the victim's blood contained oxycodone, despite

---

[1] This is much the same standard applied to the review of a trial court's decision on a motion to suppress. In those cases, the factual determinations of the trial court are conclusive unless the evidence preponderates against them while the application of the law to those factual findings is reviewed de novo. *See Odom*, 928 S.W.2d at 23.

Doctor Long's having reported a negative test result. Having deemed the statements hearsay, we must next determine whether they were admissible via any exception to the hearsay rule.

Although the rules of evidence permit expert witnesses to rely upon reliable hearsay in forming their opinions, *see* Tenn. R. Evid. 703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."); *Id.*, Advisory Comm'n Comments ("Experts in the field may base opinions on facts not in evidence under this rule. Requisite foundations are that (1) the facts must be 'reasonably relied upon by experts in the particular field' and (2) the facts must be trustworthy. With such foundations, inadmissible hearsay could support an admissible expert opinion."), the rules do not permit otherwise inadmissible evidence to be admitted under the guise of the expert's opinion unless the proponent of the evidence can show that the prejudicial effect of the evidence is substantially outweighed by the probative value of the evidence in assisting the jury's understanding of the expert's opinion, *see* Tenn. R. Evid. 703 ("Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect."). Thus, Doctor Mileusnic-Polchan was permitted to rely upon the information conveyed to her by Doctor Long via her secretary, but that information should not have been disclosed to the jury until the trial court specifically concluded that the jury's need for the information to comprehend Doctor Mileusnic-Polchan's testimony substantially outweighed the prejudicial effect of admitting otherwise inadmissible evidence. The trial court engaged in no such weighing in this case, making the evidence inadmissible via Rule 703.

Similarly, we can find no exceptions to the hearsay rule that would permit the admission of the double hearsay proffered by Doctor Mileusnic-Polchan. Consequently, the trial court erred by admitting the information. That being said, the erroneous admission of the information was harmless. The defendant admitted to police that she had rolled the victim's pacifier in oxycodone, and Doctor Mileusnic-Polchan testified that her findings in the autopsy confirmed opiate toxicity. Doctor Long's letter confirmed that the only impediment to his declaring the victim's blood positive for the presence of oxycodone was the failure of the sample to satisfy one criterion and that the failure to satisfy that criterion was likely due to the small size of the sample rather than the amount of oxycodone in the victim's system.

The defendant also contends that the admission of the information from the telephone message violated her constitutional right to confront Doctor Long. In our view,

any violation of the defendant's confrontation right was harmless beyond a reasonable doubt. *See Coy v. Iowa*, 487 U.S. 1012, 1021 (1988) ("We have recognized that other types of violations of the Confrontation Clause are subject to that harmless-error analysis, *see e. g.*, *Delaware v. Van Arsdall*, 475 U.S. [673, 679, 684 (1986)], and see no reason why denial of face-to-face confrontation should not be treated the same."). Even had the challenged evidence been excluded, the remaining evidence was more than sufficient to support the defendant's convictions.

### B.  Toxicology Testimony

The defendant also contends that Doctor Mileusnic-Polchan should not have been permitted to explain the results contained in the toxicology report because she had not been declared an expert in toxicology. This court considered and rejected a challenge to Doctor Mileusnic-Polchan's similar testimony in the defendant's first trial, concluding that Doctor Mileusnic-Polchan's "experience and medical training qualified her to testify as to the cause of the victim's death. The fact that D[octor] Long was unable to perform a corroborating test for the presence of Oxycontin in the victim's blood sample goes to the weight of the evidence presented." *Debra Elaine Kirk*, slip op. at 15. Nothing in the presentation of this same evidence during the defendant's second trial warrants our departing from this reasoning. *See Carter*, 114 S.W.3d at 902.

### III.  Double Jeopardy and Plain Error

Although not raised by the parties, we recognize, based upon this court's decision in *State v. Nigel Kavic Watkins*, No. M2009-00348-CCA-R3-CD (Tenn. Crim. App., Mar. 1, 2010), *perm. app. granted* (Tenn. Aug. 25, 2010), that the defendant's convictions of criminally negligent homicide and aggravated child abuse might violate her constitutional double jeopardy protections. In *Watkins*, this court merged convictions of reckless homicide and aggravated child abuse after concluding that dual convictions violated double jeopardy protections because they were based on the same evidence, had the same victim, and fulfilled the same legislative purpose. *Nigel Kavic Watkins*, slip op. at 10-13. The convictions in this case present the same double jeopardy problems as those in *Watkins*. However, given that our supreme court has granted the State's application for permission to appeal in *Watkins*, we cannot say that "a clear and unequivocal rule of law has been breached" warranting review of the issue as plain error. *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (providing five factors necessary for plain error review).

*Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____

JAMES CURWOOD WITT, JR., JUDGE